IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>THE STATE OF OHIO,<br>THE SIERRA CLUB and NATURAL<br>RESOURCES DEFENSE COUNCIL,<br><br>Plaintiffs,<br><br><br>v.<br><br>AK STEEL CORPORATION,<br><br>Defendant. | CIVIL ACTION NO. C-1-00530<br><br><br>SENIOR JUDGE HERMAN J. WEBER |

**CONSENT DECREE IN PARTIAL
RESOLUTION OF PENDING CLAIMS**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND VENUE | 4 |
| II. | PARTIES BOUND | 5 |
| III. | DEFINITIONS | 8 |
| IV. | COMPLIANCE OBLIGATIONS | 14 |
| V. | CORRECTIVE ACTION | 16 |
| VI. | SUPPLEMENTAL ENVIRONMENTAL PROJECT | 39 |
| VII. | CIVIL PENALTY | 44 |
| VIII. | NOTICES AND SUBMISSIONS | 45 |
| IX. | SUBMISSIONS AND APPROVALS | 48 |
| X. | STIPULATED PENALTIES | 53 |
| XI. | FORCE MAJEURE BETWEEN THE UNITED STATES, INTERVENORS AND DEFENDANT | 61 |
| XII. | POTENTIAL FORCE MAJEURE BETWEEN OHIO AND DEFENDANT | 63 |
| XIII. | DISPUTE RESOLUTION | 64 |
| XIV. | SITE ACCESS | 70 |
| XV. | EMERGENCY RESPONSE | 76 |
| XVI. | COMPLETION OF THE WORK | 77 |
| XVII. | ENFORCEMENT COSTS | 80 |

XVIII.   COVENANT NOT TO SUE OF UNITED STATES

         AND INTERVENORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

XIX.     COVENANT NOT TO SUE OF OHIO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

XX.      COVENANT NOT TO SUE OF DEFENDANT . . . . . . . . . . . . . . . . . . . . . . 88

XXI.     RECORD RETENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XXII.    GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

XXIII.   EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

XXIV.    PUBLIC COMMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

iii

List of Attachments to Consent Decree

Attachment 1 – Interim Measures Scope of Work

      Exhibit A – Sign Location Map

Attachment 2 – RCRA Facility Investigation/Corrective Measures Study Scope of Work

      Exhibit A – Preliminary List of HWMUs, SWMUs, AOCs, Spills and Additional Areas

      Exhibit B – Map of SWMUs and AOCs

      Exhibit C – Map of Additional Areas for Evaluation During RFI

      Exhibit D – Scope of Work for Intrusive Investigation of OMS Area Landfills

Attachment 3 – Supplemental Environmental Project Scope of Work

Attachment 4 – References

Attachment 5 – Map of Facility, Showing Relationship to Dicks Creek and Monroe Ditch

Attachment 6 – Maps Showing Floodplain Boundaries

      6a      Floodplain Boundary Reach 1 (East)

      6b      Floodplain Boundary Reach 1 (West)

      6c      Floodplain Boundary Reach 2 (East)

      6d      Floodplain Boundary Reach 2 (West)

Attachment 7 – Documents Identifying Information and Conditions Known by Plaintiffs

Attachment 8 – Site Access and Confidentiality Agreement

## List of Acronyms

| | |
|---|---|
| AOC | Area of Concern |
| ASR | Alternatives Summary Report |
| BH | Bore Hole |
| CAP | Corrective Action Plan |
| CCR | Current Conditions Report |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFO | Chief Financial Officer |
| CFR | Code of Federal Regulations |
| CMI | Corrective Measures Implementation |
| CMO | Corrective Measures Objectives |
| CMS | Corrective Measures Study |
| COCs | Contaminants of Concern |
| CQA | Construction Quality Assurance |
| DMR | Discharge Monitoring Report |
| DOCC | Description of Current Conditions |
| DQO | Data Quality Objective |
| EFT | Electronic Funds Transfer |
| EPA | United States Environmental Protection Agency |
| HWMU | Hazardous Waste Management Unit |
| IM | Interim Measures |
| MCL | Maximum Contaminant Level |

| | |
|---|---|
| MCS | Media Cleanup Standards |
| mg/kg | milligram per kilogram |
| mg/l | milligram per liter |
| NPDES | National Pollutant Discharge Elimination System |
| O.A.C. | Ohio Administrative Code |
| O&M | Operations and Maintenance |
| ODP | Ozone Depleting Potential |
| OEPA | Ohio Environmental Protection Agency |
| OMS | Olympic Mill Services |
| OSWER | Office of Solid Waste and Emergency Response |
| NAPL | Non-Aqueous Phase Liquids |
| NIOSH | National Institute of Occupational Safety and Health |
| PA | Preliminary Assessment |
| PCB | polychlorinated biphenyl |
| PMP | Project Management Plan |
| ppm | parts per million |
| ppb | parts per billion |
| PPE | Personal Protective Equipment |
| PRG | Preliminary Remediation Goals |
| PTI | Permit To Install |
| QAPP | Quality Assurance Project Plan |
| QA/QC | Quality Assurance/Quality Control |

| RAAR | Risk Assessment Assumptions Report |
| RCRA | Resource Conservation and Recovery Act |
| RFI | RCRA Facility Investigation |
| SCS | Soil Conservation Service |
| SEP | Supplemental Environmental Project |
| SOW | Scope of Work |
| SS | Soil Sample |
| SWMU(s) | Solid Waste Management Unit(s) |
| TCE | trichloroethylene |
| TSCA | Toxic Substances Control Act |
| µg/kg | micrograms per kilogram |
| µg/l | micrograms per liter |
| UIC | Underground Injection Control |
| USACE | United States Army Corps of Engineers |
| U.S.C. | United States Code |
| USDA | United States Department of Agriculture |
| VSI | Visual Site Inspection |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, THE STATE OF OHIO, THE SIERRA CLUB and NATURAL RESOURCES DEFENSE COUNCIL, | ) ) ) ) ) |
| Plaintiffs, | ) CIVIL ACTION NO. C-1-00530 ) ) ) |
| | ) SENIOR JUDGE HERMAN J. WEBER |
| v. | ) ) |
| AK STEEL CORPORATION, | ) ) |
| Defendant. | ) ) ) |

## CONSENT DECREE IN PARTIAL
## RESOLUTION OF PENDING CLAIMS

WHEREAS, the United States of America, on behalf of the United States Environmental

Protection Agency ("EPA"), filed an Amended Complaint ("U.S. Complaint") against Defendant,

AK Steel Corporation ("Defendant" or "AK Steel"), in this matter on October 18, 2001, seeking

injunctive relief and civil penalties for alleged violations of the Clean Air Act ("CAA"), 42

U.S.C. § 7401 *et seq*., the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., regulations

implementing those statutes, and the Ohio State Implementation Plan ("Ohio SIP") at AK Steel's

Middletown, Ohio steel production facility (the "Facility"), as well as an order for AK Steel to

perform corrective action pursuant to Section 3008(h) of the Resource Conservation Recovery

1

Act ("RCRA"), 42 U.S.C. § 6928(h). In addition, the U.S. Complaint sought enforcement of an administrative order issued by EPA pursuant to Section 7003(a) of RCRA, 42 U.S.C. § 6973(a) ("§ 7003 Order");

WHEREAS, EPA withdrew the § 7003 Order on January 17, 2003, and on or about March 28, 2003, this Court entered an Agreed Order dismissing the United States' claim relating to the § 7003 Order;

WHEREAS, Plaintiff State of Ohio, on behalf of the Ohio Environmental Protection Agency ("OEPA"), filed a First Amended Complaint ("Ohio Complaint") against AK Steel in this matter on April 5, 2001, for injunctive relief and/or the assessment of civil penalties for violations of Ohio Revised Code ("R.C.") Chapters 3704, 3734, 6111, and the rules implementing those chapters, the CAA, 42 U.S.C. § 7401 *et seq.*, the CWA, 33 U.S.C. § 1251 *et seq.*, regulations implementing those statutes, and the Ohio SIP at the Facility. Ohio brought its Complaint pursuant to Section 505(b)(1)(B) of the CWA, 33 U.S.C. § 1365(b)(1)(B), R.C. Chapter 6111, Section 304(b)(1)(B) of the CAA, 42 U.S.C. § 7604(b)(1)(B), R.C. Chapter 3704, and R.C. Chapter 3734;

WHEREAS, by Order entered January 3, 2003, the Court dismissed certain claims contained in the Ohio Complaint, specifically Claims 2-7, relating to violations of the CAA and Ohio air pollution laws, and subsequently dismissed Claim 1 by Order entered April 21, 2003;

WHEREAS, Plaintiffs Sierra Club and Natural Resources Defense Council ("Intervenors") filed a Complaint in Intervention ("Intervenors' Complaint") pursuant to Section 505(b)(1)(B) of the CWA, 33 U.S.C. § 1365(b)(1)(B), Section 304(b)(1)(B) of the CAA, 42 U.S.C. S§ 7604(b)(1)(B), and Section 7002(b)(1) of RCRA, 42 U.S.C. § 6972(b)(1), against AK

2

Steel in this matter on January 3, 2003, seeking injunctive relief and civil penalties for alleged violations of the CAA, the CWA, regulations implementing those statutes, and the Ohio SIP at the Facility, as well as an order for AK Steel to perform corrective action pursuant to Section 3008(h) of RCRA, 42 U.S.C. § 6928(h). In addition, the Intervenors' Complaint sought enforcement of the § 7003 Order;

WHEREAS, on or about March 28, 2003, this Court entered an Agreed Order dismissing the Intervenors' claim relating to the § 7003 Order;

WHEREAS, prior to entering into this Consent Decree, AK Steel collected soil samples from specified areas of the Dicks Creek floodplain ("Floodplain"), in accordance with a Floodplain Soil Sampling and Analysis Plan approved by EPA after consultation with OEPA and Intervenors, and AK Steel has agreed to provide the results of the analysis of these samples to Plaintiffs;

WHEREAS, in furtherance of both judicial efficiency and the public interest, the Parties hereto have agreed to enter into a Consent Decree to resolve Plaintiffs' pending claims for relief under the CWA, CAA, the Ohio SIP, and R.C. Chapters 3734 and 6111, and to provide for AK Steel to implement specified Interim Measures and to perform various corrective action investigations to develop more detailed information about any releases of hazardous waste or hazardous constituents at or from the Facility, the possible impact of such releases on human health and the environment and an evaluation of a range of possible corrective measures that might be used to mitigate risks from such releases, pursuant to Section 3008(h) of RCRA, 42 U.S.C. § 6928(h);

3

WHEREAS, except with respect to the "Interim Measures" or as otherwise provided in this Consent Decree, the Parties have agreed to defer resolution of issues relating to alleged liability of AK Steel under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), to implement any corrective measures that may be selected following completion of the corrective action investigations required under this Consent Decree;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and at arms length and will avoid prolonged and complicated litigation among the Parties; and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before taking any testimony; upon the pleadings; without adjudication of any issue of fact or law, except as provided in Section I, below; without this Consent Decree constituting any evidence, waiver or admission of fact, violation or liability by any party; and with the consent of the parties, it is hereby DECREED, and Defendant is ENJOINED and ORDERED as follows:

### I. **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the claims asserted herein under the CWA, CAA and RCRA pursuant to Sections 309(b) and (d), and 505(a) of the CWA, 33 U.S.C. §§ 1319(b), (d), and 1365(a); Section 3008(h) of RCRA, 42 U.S.C. § 6928(h); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the state law claims asserted by the State of Ohio pursuant to 28 U.S. C. § 1367. This Court also has jurisdiction over the parties to this Consent Decree.

4

2.      Venue is proper in this judicial district pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b); Section 3008(h) of RCRA, 42 U.S.C. § 6928(h); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1355 and 1391(b) and (c).

## II. PARTIES BOUND

3.      The provisions of this Consent Decree shall apply to and be binding upon Plaintiffs and upon Defendant, including Defendant's officers, directors, employees, agents, servants, and successors and assigns, and all persons, firms, entities and corporations acting under, through or for it or in active concert or participation with it. Defendant shall be responsible for the acts of any of its officers, directors, employees, agents, servants, successors, assigns, contractors, and consultants, which violate or cause Defendant to violate the terms hereof.

4.      Defendant agrees to undertake all actions required by the terms and conditions of this Consent Decree.

5.      Defendant waives any rights to request a hearing on this matter pursuant to §3008(b) of RCRA and 40 C.F.R. Part 24, and consents to entry of this Consent Decree by the Court as set forth in Section XXIV (Public Comment) and without a hearing pursuant to §3008(b) of RCRA as a consent order issued pursuant to §3008(h) of RCRA.

6.      The undersigned representative(s) of Defendant, the Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, the Ohio Assistant Attorney General signing this Consent Decree, and the undersigned representative(s) of the Intervenors, each certifies that he or she is fully authorized to execute this Consent Decree and to legally bind the party whom he or she represents to this Consent Decree.

5

7.      No change in ownership or corporate status shall in any way alter Defendant's responsibilities under this Consent Decree. In the event of any conveyance of title, easement, or other interest in the Facility (as defined in Section III of this Consent Decree), all of Defendant's obligations under this Consent Decree shall continue to be met by Defendant, except as provided in Paragraphs 9 and 10.

8.      In the event that Defendant proposes to sell or transfer the real property or operations subject to this Consent Decree, Defendant shall give written notification to the Plaintiffs in accordance with Section VIII (Notices and Submissions) of this Consent Decree, identifying such purchaser or transferee in interest at least thirty (30) days prior to the sale or transfer. At least thirty (30) days prior to any such conveyance, Defendant shall also provide a copy of this Consent Decree to any person or entity to whom Defendant intends to make such conveyance, and shall condition such sale or transfer upon the purchaser or transferee submitting to the jurisdiction of this Court, becoming a party to this Consent Decree and being subject to the obligations of Defendant under this Consent Decree as provided in Paragraph 9.

9.      This Consent Decree shall not be construed to impede the transfer of any real property or operations between Defendant and any purchaser as long as the requirements of this Consent Decree are met. Any such purchaser shall: (1) provide Defendant, Government Plaintiffs, and their representatives, including agencies, employees, authorized agents, contractors and subcontractors of Defendant and Government Plaintiffs with access to the purchased property or operations for purposes of implementing any Work required under this Consent Decree and for any other purpose specified in Section XIV (Site Access); (2) cooperate with implementation of the Work and refrain from any action that would interfere with or hinder the effectiveness or

6

timely completion of the Work; and (3) agree to implement any institutional controls necessary to assure effectiveness of the Work. This Consent Decree shall not be construed to prohibit a contractual allocation – as between Defendant and any purchaser – of the burdens of compliance with this Consent Decree, provided that Defendant shall remain liable to the Plaintiffs for the obligations of the Consent Decree applicable to the transferred or purchased ownership interests, except as provided in Paragraph 10.

10.     If EPA, OEPA and Intervenors in their unreviewable discretion agree, Defendant and any purchaser that has become a party defendant to this Consent Decree pursuant to Paragraph 8, above, may seek modification of the Consent Decree pursuant to Paragraph 119, below, to relieve Defendant of its liability for specified obligations and liabilities under this Consent Decree, and to subject the purchaser to specified obligations, liabilities and rights of Defendant under this Consent Decree, as identified in the motion to modify. Notwithstanding the foregoing, Defendant may not assign, and may not be released from, any obligation under this Consent Decree that is not specific to the purchased or transferred real estate, including the obligations set forth in Sections VI (Supplemental Environmental Project) and VII (Civil Penalty).

11.     Defendant shall be required to notify each Contractor retained to perform Work pursuant to Section V (Corrective Action) and the Supplemental Environmental Project ("SEP") pursuant to Section VI (Supplemental Environmental Project) of this Consent Decree of each of the requirements of this Consent Decree relevant to the activities to be performed by the Contractor, including all schedules and reporting deadlines relevant to the Work to be performed by the Contractor. Defendant shall further require that each such Contractor above notify each of its

7

subcontractors retained to perform Work pursuant to Section V (Corrective Action) and the SEP

pursuant to Section VI (Supplemental Environmental Project) of each of the requirements of this

Consent Decree applicable to the Work or SEP, as relevant to the activities to be performed by

such subcontractor. In any action or proceeding to enforce this Consent Decree, Defendant shall

not raise as a defense the failure by any of its agents, servants, contractors, subcontractors or

employees to take actions necessary to comply with the Consent Decree, except where such

failure is the result of circumstances that meet the criteria of Section XI (Force Majeure Between

the United States, Intervenors and Defendant) or Section XII (Potential Force Majeure Between

Ohio and Defendant) of this Consent Decree.

## III. DEFINITIONS

12.     Unless otherwise stated, terms used in this Consent Decree shall have the meaning given

to those terms in the CWA, RCRA, and CAA and their implementing regulations as of the

lodging of this Consent Decree.

13.     The following terms used in this Consent Decree or the attachments hereto shall be

defined as follows:

        a.      "Additional Areas" shall mean (1) any areas of Dicks Creek Floodplain adjacent

to Reach 1 or Reach 2 not owned by AK Steel; (2) areas where Hazardous Waste or Hazardous

Constituents have migrated from the Facility; and (3) areas identified on Exhibit C to

Attachment 2.

        b.      "Area of Concern" means any area of the Facility under the control of the owner

or operator where a release to the environment of Hazardous Waste(s) or Hazardous Constituents

has occurred, is suspected to have occurred, or may occur, regardless of the frequency or

duration of the release.

8

      c.     "Consent Decree" means this Consent Decree in Partial Resolution of Pending Claims and all attachments hereto, as well as plans, reports, schedules, and other items and deliverables approved by EPA pursuant to this Consent Decree. In the event of a conflict between this Consent Decree and any attachment hereto, or plan, report, item or deliverable approved by EPA pursuant to this Consent Decree, this Consent Decree shall govern.

      d.     "Contaminants" and/or "Contamination" shall mean any "hazardous waste" as defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), or 40 C.F.R. § 260.10; any "hazardous constituent" listed in Appendix VIII to 40 C.F.R. Part 261 or any constituent identified in Appendix IX to 40 C.F.R. Part 264; any "hazardous waste" as defined in R.C. 3734.01(J); and any "industrial waste" or "other waste" as defined in R.C. 6111.01, as each of these provisions is codified at the date of lodging, provided, however, that only "industrial waste" or "other waste" that impairs or has the potential to impair water quality in a water of the State of Ohio is included in this definition.

      e.     "Contractor" means any contractor, subcontractor, consultant, or laboratory retained to conduct or monitor any portion of the Work or SEP performed pursuant to this Consent Decree.

      f.     "Corrective Measures Study" or "CMS" means that portion of the RCRA corrective action process that provides for identification and evaluation of potential remedial alternatives for the releases that have been identified at and/or from the Facility as part of the RFI.

      g.     "Data Quality Objectives" means the qualitative or quantitative statements expressing acceptable levels of uncertainty. The Data Quality Objectives process is designed to

collect data that are scientifically valid, defensible and of known precision and accuracy relative to the use(s) for which the data are obtained.

    h.    "Day" as used in this Consent Decree shall mean calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day. Working day means a day other than a Saturday, Sunday, or Federal holiday.

    i.    "Defendant" means AK Steel Corporation.

    j.    "Dicks Creek" means the perennial stream which flows generally from east to west adjacent to Defendant's Facility, and which is a tributary of the Great Miami River. Relevant portions of Dicks Creek are shown on the map attached hereto as Attachment 5.

    k.    "EPA" means the United States Environmental Protection Agency and any successor agencies or departments.

    l.    "Existing Contamination" means (1) with respect to Reach 1 and Reach 2 of Dicks Creek, the Outfall 002 channel, and Monroe Ditch, any Contaminants present in such areas as of the date of lodging of this Consent Decree; and (2) with respect to the Floodplain, any Contaminants present in the Floodplain as of the date of entry of this Consent Decree.

    m.    "Facility" means the steel production facility owned and/or operated by Defendant and located at 1801 Crawford Street in Middletown, Butler County, Ohio and all contiguous property owned by Defendant, including the slag processing area. The Facility is shown on Attachment 5.

    n.    "Floodplain" means the area within the Floodplain boundaries designated on Attachment 6.

10

o.     "Government Plaintiffs" means the United States and the State of Ohio.

p.     "Hazardous Constituents" shall mean those constituents listed in Appendix VIII to 40 C.F.R. Part 261 as codified at the date of lodging, or any constituent identified in Appendix IX to 40 C.F.R. Part 264 as codified at the date of lodging.

q.     "Hazardous Waste" shall mean hazardous wastes as defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), or 40 C.F.R. § 260.10, as codified at the date of lodging, and shall include Hazardous Constituents as defined above.

r.     "Hazardous Waste Management Unit" or "HWMU" shall mean a contiguous area of land on or in which hazardous waste is placed, or the largest area in which there is significant likelihood of mixing hazardous waste constituents in the same area. Examples of such units include a surface impoundment, a waste pile, a land treatment area, a landfill cell, a tank and its associated piping and containment system, and a container storage area, including the containers and the land or pad upon which they are placed.

s.     "Interceptor Trench" means the sump, piping and other appurtenances, and activated carbon treatment system, which was installed in January 1998, and subsequently extended, designed to capture and treat seeps containing polychlorinated biphenyls ("PCBs") emanating from the slag processing area at the Facility.

t.     "Interim Measures" mean the actions required to be initiated by the Defendant under this Consent Decree prior to completion of the Corrective Measures Study to control or abate potential threats to human health and the environment and/or to prevent or minimize the release or potential release of Hazardous Wastes, Hazardous Constituents or Contaminants at or from the Facility or Additional Areas. Interim Measures include each of the measures identified

11

in Section II (Scope) of Attachment 1 to this Consent Decree, as well as any additional Interim Measures that are proposed by Defendant pursuant to Subparagraph 22.c and subsequently approved by EPA.

u.      "Interim Measures SOW" means the Scope of Work for performing the Interim Measures under this Consent Decree, which is attached hereto as Attachment 1.

v.      "Intervenors" means the Sierra Club and Natural Resources Defense Council.

w.      "Monroe Ditch" means the stream which is a tributary of Dicks Creek and flowing generally from south to north adjacent to Defendant's closed landfills at the west end of the slag processing area of the Facility, and is also known as the landfill tributary. Relevant portions of Monroe Ditch are shown on the map attached hereto as Attachment 5.

x.      "OEPA" means the Ohio Environmental Protection Agency and any successor agencies or departments.

y.      "Ohio" means the State of Ohio, on behalf of OEPA.

z.      "Plaintiffs" shall mean the United States, Ohio, and the Intervenors collectively.

aa.     "RCRA Facility Investigation" or "RFI" means that portion of the RCRA corrective action process under this Consent Decree with the purpose of determining the nature, impact and extent of releases of Hazardous Waste, Hazardous Constituents or Contaminants from regulated units, solid waste management units, areas of concern, and other source areas at and from the Facility and to gather all necessary data to support a Corrective Measures Study, which includes the activities described in the RFI/CMS SOW that is attached hereto as Attachment 2.

12

bb.    "Reach 1" means the stretch of Dicks Creek extending from approximately 50 feet
upstream of Defendant's Outfall 002 to approximately 50 feet downstream of the former United
States Geological Service ("USGS") gauging station downstream of Yankee Road in
Middletown, Ohio.

cc.    "Reach 2" means the stretch of Dicks Creek extending from the terminus of
Reach 1 to approximately three hundred (300) feet downstream of the Main Street Bridge in
Middletown, Ohio.

dd.    "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying,
discharging, injecting, escaping, seeping, leaching, dumping, or disposing of Hazardous Waste,
Hazardous Constituents or Contaminants into the environment.

ee.    "RFI/CMS SOW" means the Scope of Work for performing a RCRA Facility
Investigation and a Corrective Measures Study at the Facility under this Consent Decree, which
is attached hereto as Attachment 2.

ff.    "SEP SOW" means the Scope of Work for performing the Supplemental
Environmental Project described in Paragraph 25 of this Consent Decree that is attached hereto
as Attachment 3.

gg.    "Solid Waste Management Unit or SWMU" shall mean any discernable unit at
which solid wastes have been placed at any time regardless or whether the unit was intended for
the management of solid or hazardous wastes. Such units include any area at the Facility where
solid wastes have been routinely or systematically placed or released.

hh.    "Stabilization" shall mean, solely for purposes of this Consent Decree, any
corrective action activity required to be initiated pursuant to Paragraph 22 at any time prior to
completion of the CMS in order to:

13

    1)  prevent or minimize any significant further spread of previously-released

Contaminants in a near to mid-term (5-10 year) time frame;

    2)  prevent new contamination from occurring; or

    3)  control or reduce actual or imminent exposure threats to humans or

ecological receptors at and/or near the Facility and Additional Areas;

based on a determination that one or more of the foregoing conditions may present a significant

risk to human health and the environment. For purposes of this Consent Decree, Stabilization

shall not include Interim Measures identified in Section II (Scope) of Attachment 1 or any

additional Interim Measures that are proposed by Defendant pursuant to Subparagraph 22.c and

subsequently approved by EPA.

  ii.  "Submission or Submittal" shall mean any Workplan, report, progress report, or

any other written document Defendant is required by this Consent Decree to send to EPA.

  jj.  "United States" means the United States of America, on behalf of EPA.

  kk.  "Work" means all activities to be performed pursuant to Section V (Corrective

Action) and the SOWs attached as Attachments 1 and 2 of this Consent Decree.

  ll.  "Workplan" shall mean a detailed plan prepared by Defendant to satisfy the

requirements of this Consent Decree or any corresponding scope of work specified in

Attachments 1 and 2.

## IV. COMPLIANCE OBLIGATIONS

14. Compliance.

  a.  Defendant shall achieve and maintain compliance with Defendant's current

NPDES Permit No. 1ID00001*ID and any renewal or modification of such permit ("NPDES

14

Permit"), the provisions of the CWA, 33 U.S.C. § 1281 *et seq.* and regulations promulgated thereunder, R.C. Chapter 6111, and rules promulgated thereunder. Defendant shall maintain compliance at the coke by-product recovery plant with the leak detection and repair requirements of 40 C.F.R. Part 61, Subpart L, Sections 61.132(b) and (c), and 61.135(a) and (d).

     b.     Defendant shall not recommence operations of the Sinter Plant Windbox Stack unless and until it provides written notification to Plaintiffs of its intent to start up the Sinter Plant at least sixty (60) days prior to the startup. Within ninety (90) days after startup of the Sinter Plant, Defendant shall conduct a particulate emissions test at the outlet of the windbox stack. Defendant shall provide a copy of the test report to Plaintiffs within thirty (30) days following completion of the test.

     c.     If Defendant recommences operation of the Sinter Plant pursuant to Subparagraph 14.b, Defendant shall, upon startup of the Sinter Plant, comply with all applicable state and federal regulations, including but not limited to, Ohio Administrative Code ("O.A.C.") 3745-17-11.

     d.     Within sixty (60) days of the entry of this Consent Decree, Defendant shall submit to OEPA an after-the-fact permit-to-install ("PTI") application pursuant to O.A.C. Chapter 3745-42, for the as-built PCB interceptor trench and treatment system located at the OMS site.

     e.     Within thirty (30) days after entry of this Consent Decree, Defendant is enjoined and ordered to submit to OEPA an updated RCRA Part A Permit Application in order to attain compliance with the Permit by Rule requirements of O.A.C. 3745-50-46(B).

15

15. Compliance Reporting.

a. Defendant shall submit to EPA, on a monthly basis, effluent Discharge

Monitoring Reports ("DMRs") either in electronic format or hard copy format on the OEPA

4500 report form preprinted by OEPA for each individual sampling station. Such DMRs are to

be submitted no later than the 15th day of the month following the reporting period.

b. Defendant shall submit to EPA and Intervenors a copy of each report that

Defendant is required to submit to OEPA pursuant to Section III, Paragraphs 11.B, 11.D or 12.C

of NPDES permit no. 1ID00001*ID or any modification or renewal thereof.

c. Defendant shall submit to EPA, OEPA and Intervenors on a semiannual basis, a

report that details instances where the repair requirements of 40 C.F.R. §§61.132(b)(3) and (4)

and 61.135(a) and (d) were not met.

d. For purposes of submission to EPA, all reports and submissions required pursuant

to Subparagraphs 15.a and 15.b of this Paragraph shall be submitted to the following individual

in lieu of the United States' contacts listed in Paragraph 39:

> Branch Secretary
> U.S. Environmental Protection Agency, Region 5
> Water Division
> Water Enforcement and Compliance Assurance Branch
> Mail Code: WC-15J
> 77 West Jackson Blvd.
> Chicago, IL 60604

e. Nothing in this Consent Decree alters or affects in any way any reporting

requirements established by the NPDES Permit.

## V. CORRECTIVE ACTION

16. All Work undertaken by Defendant pursuant to this Consent Decree shall be performed in

accordance with the attached Scopes of Work ("SOW"); all EPA-approved Workplans; RCRA

16

and other applicable Federal laws and their implementing regulations; any applicable Ohio laws and their implementing regulations; and in a manner consistent with relevant federal and Ohio guidance documents (hereinafter "guidance documents"), including guidance documents issued or revised following entry of this Consent Decree, as specified in Subparagraphs 16.a through 16.f, below. Attachment 4 identifies guidance documents relevant to the Work required pursuant to the Consent Decree; however, it is not intended to identify all guidance documents that may be relevant to every activity that may be undertaken pursuant to the Consent Decree.

     a.     If, prior to Defendant's submission of any plan or other submittal required pursuant to this Consent Decree, any Party believes that any additional or revised guidance documents not listed in Attachment 4 are relevant to Work to be performed pursuant to such plan or submittal, such Party shall, as early as possible, provide to the other Parties written notice identifying such additional or revised guidance documents and describing in detail how such guidance would be applied to the Work to be performed. Any Party may request a conference to exchange views regarding the relevance and/or application of any such additional or revised guidance documents. Following any conference or if no conference is held, within 30 days, EPA shall issue a written determination concerning the relevance and application of any identified additional or revised guidance documents. Any Party that does not agree with EPA's determination may invoke the procedures of Section XIII (Dispute Resolution) of the Consent Decree.

     b.     If, following Defendant's submission of any plan or other submittal required pursuant to the Consent Decree, any Party believes that any additional or revised guidance documents not listed in Attachment 4 are relevant to Work to be performed pursuant to such plan

17

or submittal, such Party shall, as early as possible, provide to the other Parties written notice identifying such additional or revised guidance documents and describing in detail how the guidance would be applied to the Work to be performed. EPA's determination concerning the relevance of any additional or revised guidance document identified by any party shall be included in EPA's approval, disapproval or modification of the plan or other submittal, and shall be subject to the provisions of Sections IX (Submissions and Approvals) and XIII (Dispute Resolution) of the Consent Decree.

    c.    Following approval of any plan or other submittal required pursuant to the Consent Decree, any Party may provide to the other Parties written notice identifying additional or revised guidance documents that it believes need to be applied to any activities remaining to be undertaken pursuant to such plan or submittal and describing in detail how such guidance would be applied to the Work to be performed. Any Party may request a conference to exchange views regarding the relevance and/or application of any such additional or revised guidance documents. Following any conference or if no conference is held, within 30 days, EPA shall issue a written determination concerning the relevance and application of any identified additional or revised guidance documents. Any Party that does not agree with EPA's determination may invoke the procedures of Section XIII (Dispute Resolution) of the Consent Decree. In accordance with EPA's written determination, Defendant shall apply such additional or revised guidance documents prospectively, to the Work remaining to be undertaken pursuant to such plan or submittal, without prejudice to the existing Work and subject to the provisions of Section XIII (Dispute Resolution) of the Consent Decree. Nothing in this Paragraph shall be construed to limit application of the provisions of Paragraph 22 of this Consent Decree.

18

d.     Prior to Defendant's submission of any plan or other submittal required pursuant to the Consent Decree, or any proposed modification of such plans or other submittals, any Party may identify in writing and as early as possible any conflict or inconsistency between guidance documents relevant to the Work covered by such plan or submittal. Any Party may request a conference to exchange views regarding any identified conflicts or inconsistencies. As soon as possible following any such conference or if no conference is held, within 30 days, EPA shall issue a written determination regarding any identified conflicts or inconsistencies and how they should be resolved. Any Party that does not agree with EPA's determination may invoke the procedures of Section XIII (Dispute Resolution) of the Consent Decree.

e.     Following Defendant's submission of any plan or other submittal required pursuant to the Consent Decree, or any proposed modification of such plans or other submittals, any Party may identify any conflict or inconsistency between guidance documents relevant to the Work covered by such plan or submittal. Following identification of any conflict or inconsistency between guidance documents, any Party may request a conference to exchange views regarding the identified conflicts or inconsistencies. EPA's approval or disapproval of the plan or other submittal, or modification thereof, if applicable, shall specify how, and to what extent, any identified conflicting or inconsistent guidance documents shall apply to the Work covered by the plan or other submittal, or modification thereof, subject to the provisions of Section IX (Submissions and Approvals) and Section XIII (Dispute Resolution) of the Consent Decree.

f.     If any conflict or inconsistency between guidance documents relevant to any Work required pursuant to the Consent Decree is identified by any Party following approval of

19

any plan or submittal covering such Work, any Party may request a conference to exchange views regarding the identified conflicts or inconsistencies. Following any such conference or if no conference is held, within 30 days, EPA shall issue a written determination as soon as possible specifying how, and to what extent such conflicting or inconsistent guidance documents shall apply to Work required pursuant to the Consent Decree. Any Party that does not agree with EPA's determination may invoke the procedures of Section XIII (Dispute Resolution).

17.     Pursuant to Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), Defendant shall perform Interim Measures in accordance with all provisions, terms, and schedules set forth in this Consent Decree, including any attachments hereto. The Interim Measures to be performed by Defendant are more fully described in the Interim Measures SOW attached hereto as Attachment 1.

18.     Pursuant to Section 3008(h) of RCRA, 42 U.S,C, § 6928(h), Defendant shall perform a RCRA Facility Investigation or RFI in accordance with all provisions, terms, and schedules set forth in this Consent Decree, including any attachments hereto. The RFI to be performed by Defendant is more fully described in the RFI/CMS SOW attached hereto as Attachment 2, including Exhibit A (Preliminary List of HWMUs, SWMUs and AOCs, Spills and Additional Areas), Exhibit B (Map of SWMUs and AOCs) , Exhibit C (Map of Additional Areas for Evaluation During the RFI) and Exhibit D (Scope of Work for Intrusive Investigation of OMS Area Landfills).

19.     Pursuant to Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), Defendant shall perform a Corrective Measures Study or CMS in accordance with all provisions, terms, and schedules set

20

forth in this Consent Decree, including any attachments hereto. The CMS to be performed by Defendant is more fully described in the RFI/CMS SOW attached hereto as Attachment 2.

20.     Pursuant to Section IX (Submissions and Approvals) of this Consent Decree, copies of each of the plans, reports, schedules, and other items and deliverables required under this Consent Decree or either of Attachments 1 and 2 must be submitted to EPA for approval. Copies shall be provided to Plaintiffs in accordance with the requirements of Section VIII (Notices and Submissions).

21.     If, prior to Defendant's Request for an Acknowledgment of Completion pursuant to Section XVI (Completion of the Work) of this Consent Decree, EPA, after reasonable opportunity for review and comment from OEPA and Intervenors, determines that Defendant's performance of the Work is inadequate or incomplete, EPA will notify Defendant in writing of the activities that must be undertaken to complete the Work, and will set forth in the notice a reasonable period for Defendant to complete the Work. Defendant shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to any right provided in this Consent Decree to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution).

22.     Additional Work.

a.     "Additional Work" shall mean any activity or requirement, including investigatory work, engineering evaluations, Stabilization activities or procedure/methodology modifications, not otherwise required under this Consent Decree or any EPA-approved Workplan, and which is approved by EPA pursuant to this Paragraph 22.

21

b. After reasonable opportunity for review and comment by OEPA and the Intervenors, EPA may determine that Additional Work is necessary:

    i. to assure that the RFI and CMS implemented pursuant to this Consent Decree adequately provide:

        (1) an identification and evaluation of the nature, and extent of any releases of Hazardous Waste or Hazardous Constituents at or from the Facility, and the impact of any such releases on human health and the environment,

        (2) an identification and evaluation of appropriate corrective measures alternatives necessary to prevent, mitigate and/or remediate any releases of Hazardous Waste or Hazardous Constituents at or from the Facility, and

        (3) a basis for EPA's subsequent determinations concerning the need for and nature of any corrective measures that may be appropriate to address any releases of Hazardous Waste or Hazardous Constituents at or from the Facility; or

    ii. for Stabilization.

c. In addition, Defendant may submit for approval by EPA, after reasonable opportunity for review and comment by OEPA and the Intervenors, a workplan describing Additional Work that AK Steel proposes to implement in addition to the tasks described in Section II of Attachment 1 and included in any EPA-approved Workplan.

d. After reasonable opportunity for review and comment by OEPA and Intervenors as provided in Subparagraphs 22.b and 22.c above, EPA will notify Defendant in writing of its determination that Additional Work is necessary or (in the case of Additional Work proposed by Defendant) appropriate. The notice shall specify a deadline for submission of a workplan for

22

such Additional Work, if required, and specify the contents of such workplan. In the case of any determination to require Additional Work pursuant to Subparagraph 22.b, the notice shall also identify the provision(s) of Subparagraph 22.b that provide the basis for EPA's determination that Additional Work is necessary.

 e. Within twenty (20) days after receipt of any notice referred to in Subparagraph 22.d or such longer time as may be agreed to by the Parties in writing, Defendant shall have the opportunity to meet or confer with EPA, as well as OEPA and the Intervenors, to discuss and reach agreement concerning the Additional Work.

 f. If Defendant does not exercise the opportunity to meet or confer with EPA in accordance with Subparagraph 22.e, Defendant shall proceed to take any action required by the notice, including submission of a Workplan for Additional Work, if applicable, in accordance with the schedule established pursuant to Subparagraph 22.d.

 g. Based on any meeting or conference pursuant to Subparagraph 22.e, EPA may, after reasonable opportunity for review and comment by OEPA and Intervenors, agree to withdraw or modify any notice pursuant to Subparagraph 22.d or determine that the originally proposed modifications or conditions are appropriate. Any such decision shall be in writing.

 h. Unless EPA withdraws the notice issued to Defendant in accordance with Subparagraph 22.g, following any meeting or conference pursuant to Subparagraph 22.e, Defendant shall proceed to take any action required by the notice issued pursuant to Subparagraph 22.d, or any modification of the notice pursuant to Subparagraph 22.g, including the submission of a Workplan for Additional Work, if applicable, subject only to formal dispute resolution pursuant to Paragraph 75.

23

i.      Upon approval of a Workplan by EPA, Defendant shall implement it in accordance with the schedule and provisions contained therein. Provided, however, that the schedule may be revised to the extent that 1) Defendant has notified Plaintiffs of the need to revise the schedule for submittal and the reasons for the revisions of the schedule at least twenty-one (21) days in advance of the original deadline, and 2) the Parties have agreed upon a revised schedule in advance of the original deadline.

23.     Project Coordinator.

a.      Within fifteen (15) days of the effective date of this Consent Decree, EPA, OEPA and Defendant shall each designate a Project Coordinator. Each Project Coordinator shall be responsible for overseeing the implementation of this Consent Decree and for designating a person to act in their absence. The EPA Project Coordinator will be EPA's designated representative for the Facility. To the maximum extent practicable, all communications between Defendant, EPA, and OEPA and all documents, reports, approvals, and other correspondence concerning the activities performed pursuant to this Consent Decree shall be directed through the Project Coordinators, except as provided in Section VIII (Notices and Submissions) and Paragraph 15.d. EPA, OEPA, and Defendant shall each notify each Party in writing of the Project Coordinator it has selected.

b.      Within fifteen (15) days of the effective date of this Consent Decree, Intervenors shall designate a single Project Representative, who shall be responsible for (i) providing EPA with any comments of Intervenors on any plan, report, schedule, or other item or deliverable that Defendant submits for approval pursuant to this Consent Decree; and (ii) presenting any positions of Intervenors with respect to any issues that arise during informal dispute resolution

24

pursuant to Paragraph 72 or during any meeting or conference among the parties pursuant to Paragraph 22 or Sections IX (Submissions and Approvals) or XVI (Completion of the Work) of this Consent Decree. Intervenors shall notify each party in writing of the Project Representative that it has selected.

     c.    Defendant, EPA and OEPA may change their Project Coordinators, and Intervenors may change their Project Representative, but agree to provide at least fourteen (14) days written notice prior to any such change, where practicable.

     d.    The absence of the EPA Project Coordinator from the Facility shall not be cause for the stoppage of Work.

24.    Assurances of Financial Responsibility for Completing the Work

     a.    Cost Estimates  Within sixty (60) days after the effective date of this Consent Decree Defendant shall submit to EPA and OEPA, for approval by EPA after consultation with OEPA, a detailed written initial estimate, in current dollars, of the cost of hiring a third party to perform the Work. The initial cost estimate must account for the total costs of the Work for the entire period of this Consent Decree, including any necessary long term costs, such as operation and maintenance costs and monitoring costs. A third party is a party who (1) is neither a parent nor a subsidiary of Defendant, (2) does not share a common parent or subsidiary with Defendant, and (3) is in no way affiliated with Defendant. The cost estimate must not incorporate any salvage value that may be realized from the sale of wastes, facility structures or equipment, land or other assets associated with the Facility.

          i.    Concurrent with the submission of a Workplan for Additional Work required under Paragraph 22, Defendant shall submit revised detailed written estimate(s),

25

in current dollars, of the cost of hiring a third party to perform the Additional Work.

ii.     Until the Work required by this Consent Decree is completed, Defendant must annually adjust the cost estimate(s) for inflation and submit the adjusted cost estimate(s) to Plaintiffs by March 31 after the close of Defendant's previous fiscal year. In addition, Defendant must adjust the cost estimate(s) and submit the adjusted cost estimate(s) to Plaintiffs if any Additional Work is required, pursuant to Paragraph 22, or if any other condition increases the cost of the Work to be performed under this Consent Decree.

b.     Assurances of Financial Responsibility for Completing the Work

i.     In order to secure the completion of the Work in accordance with this Consent Decree, Defendant shall establish financial assurance for the benefit of EPA. Within sixty (60) days after the effective date of this Consent Decree, concurrently with Defendant's submission of the initial cost estimate required by Subparagraph 24.a.i , Defendant shall submit draft financial assurance instruments to EPA and OEPA, for approval by EPA after consultation with OEPA. Within thirty (30) days after approval of both the initial cost estimate and the draft financial assurance instruments, whichever date is later, Defendant shall establish financial assurance in an amount at least equal to the approved initial cost estimate.

ii.     Defendant may use any of the instruments or mechanisms generally described in Subparagraphs 24.b.ii.(1)-(6). Any and all financial assurance instruments or mechanisms provided pursuant to this Consent Decree shall be consistent with 40

26

C.F.R. § 264.151, to the extent appropriate to the Work required under this Consent
Decree, and shall be subject to approval by EPA after consultation with OEPA.

(1)     A trust fund established for the benefit of EPA, administered by a
trustee who has the authority to act as a trustee under Federal or State law and
whose trust operations are regulated and examined by a Federal or State agency.
The trust agreement shall provide that the trustee shall make payments from the
fund as the EPA shall direct in writing: (A) to reimburse Defendant from the fund
for expenditures made by Defendant for Work performed in accordance with this
Consent Decree, or (B) to pay any other person whom the EPA determines has
performed or will perform the Work in accordance with this Consent Decree. The
trust agreement shall further provide that the trustee shall not refund to the grantor
any amounts from the fund unless and until EPA has advised the trustee that (A)
EPA has agreed to reduce the amount of financial assurance required pursuant to
Subparagraph 24.b.xvi or (B) EPA has issued an Acknowledgment of Final
Completion of the Work pursuant to Section XVI (Completion of the Work) of
the Consent Decree.

(2)     A surety bond guaranteeing performance of the Work in
accordance with this Consent Decree or payment at the direction of EPA into a
standby trust fund that meets the requirements of the trust fund in Subparagraph
24.b.ii.(1) above. The surety company issuing the bond must be an independent,
third-party, in no way affiliated with Defendant, and be among those listed as

27

acceptable sureties on Federal Bonds as set forth in Circular 570 of the U.S. Department
of the Treasury.

      (3)     One or more irrevocable letters of credit, payable at the direction
of EPA, into a standby trust fund that meets the requirements of the trust fund in
Subparagraph 24.b.ii.(1) above. The letter(s) of credit must be issued by one or
more financial institution(s): (A) with the authority to issue letters of credit, and
(B) whose letter-of-credit operations are regulated and examined by a Federal or
State agency.

      (4)     A policy of insurance that: (A) provides EPA with acceptable
rights as a beneficiary thereof; and (B) is issued by an insurance carrier with the
authority to issue insurance policies in the applicable jurisdiction(s), who is
independent, a third-party as defined in Subparagraph 24.a, and whose insurance
operations are regulated and examined by a Federal or State agency. The
insurance policy must be issued for a face amount at least equal to the current cost
estimate for the Work to be performed under this Consent Decree, except where
costs not covered by the insurance policy are covered by another instrument, as
permitted in Subparagraph 24.b.viii of this Paragraph. The Policy must provide
that the insurer shall make payments as the EPA shall direct in writing: (A) to
reimburse Defendant for expenditures made by Defendant for Work performed in
accordance with this Consent Decree, or (B) to pay any other person whom the
EPA determines has performed or will perform the Work in accordance with this
Consent Decree, up to an amount equal to the face amount of the policy.

(5)     A written corporate guarantee, executed in favor of the EPA by one  or more of the following:  (A) a direct or indirect parent company, or (B) a company that has a "substantial business relationship" with Defendant (as defined in 40 C.F.R. § 264.141(h)), to perform the Work in accordance with this Consent Decree or to establish a trust fund as permitted by Subparagraph 24.b.ii.(1); provided, however, that any company providing such a guarantee must demonstrate that it satisfies the financial test requirements of 40 C.F.R. § 264.143(f) with  respect to the estimated cost of the Work that it proposes to guarantee; or

(6)     A written financial test; provided, however, that Defendant must demonstrate that it satisfies the financial test requirements of 40 C.F.R. § 264.143(f) with respect to the estimated cost of the Work that it proposes to guarantee.

iii.     The financial assurance instruments or mechanisms authorized by Subparagraph 24.b.ii shall be issued for a face amount at least equal to the current cost estimate for the Work to be performed under this Consent Decree, except where costs not covered by the instrument or mechanism are covered by another instrument or mechanism, as permitted in Subparagraph 24.b.viii.

iv.     If Defendant seeks to establish financial assurance by using any surety bond or letter of credit, Defendant shall also establish and maintain a standby trust fund into which funds from the other financial assurance instrument can be deposited, if the financial assurance provider is directed to do so by EPA, pursuant to Subparagraph 24.b.xiii.

29

     v.     If Defendant seeks to establish financial assurance by providing a corporate guarantee or financial test pursuant to Subparagraph 24.b.ii.(5) or (6), Defendant shall also comply with the other relevant requirements of 40 C.F.R. § 264.143(f), 40 C.F.R. § 264.151(f), and 40 C.F.R. § 264.151(h)(1) relating to these methods, unless otherwise provided in this Consent Decree, including: (A) initial submission of required financial reports and statements from the chief financial officer and independent certified public accountant of Defendant or its corporate guarantor, as applicable; (B) annual re-submission of such reports and statements within ninety (90) days after the close of each fiscal year of Defendant or its corporate guarantor, as applicable; and (C) notification that Defendant or, if applicable, its corporate guarantor no longer satisfies the financial test requirements set forth at 40 C.F.R. § 264.143(f)(1), which notice shall be provided to EPA within ninety (90) days after the close of Defendant's fiscal year (in the case of any instance in which Defendant no longer satisfies such financial test requirements) or within ninety (90) days after the close of any corporate guarantor's fiscal year (in the case of each instance in which the corporate guarantor no longer satisfies such financial test requirements). EPA reserves the right to request additional information (including financial statements and accountant's reports) from the Defendant or corporate guarantor at any time.

     vi.     For purposes of the corporate guarantee and financial test described in Subparagraphs 24.b.ii.(5) and (6) above, references in 40 C.F.R. § 264.143(f) to "the sum of current closure and post-closure costs and the current plugging and abandonment cost estimates" shall mean "the sum of all environmental remediation obligations" (including

30

obligations under CERCLA, RCRA, UIC, TSCA and any other state or tribal environmental obligation) for which the Defendant or corporate guarantor is demonstrating assurance through the financial test in accordance with 40 C.F.R. § 264.143(f), including the cost of the Work to be performed in accordance with this Consent Decree.

vii. For purposes of the corporate guarantee and financial test described in Subparagraphs 24.b.ii.(5) and (6) above, references in 40 C.F.R. § 264.143(f) to a "special report from the owner's or operator's certified public accountant to the owner or operator" shall mean a "report of procedures and findings from Defendant's (or, if applicable, Defendant's corporate guarantor's) certified public accountant resulting from an agreed-upon procedures engagement that describes the procedures performed and related findings, including whether or not discrepancies were found in the comparison of information included in the letter from Defendant's (or Defendant's corporate guarantor's) Chief Financial Officer (CFO) and Defendant's (or Defendant's corporate guarantor's) independently audited, year-end financial statements for the latest fiscal year, including all notes and attachments. Where discrepancies exist between Defendant's (or Defendant's corporate guarantor's) CFO letter and Defendant's (or Defendant's corporate guarantor's) independently audited, year-end financial statements, the report of procedures and findings will provide a line-by-line reconciliation of each discrepancy."

viii. Defendant may combine more than one mechanism to demonstrate financial assurance for the Work to be performed in accordance with this Consent

31

Decree, except that mechanisms guaranteeing performance rather than payment may not be combined with other instruments.

ix.     The form and substance of any and all financial assurance instrument(s) provided pursuant to this Consent Decree (including, but not limited to, the initial trust fund, irrevocable letter of credit, surety bond, insurance policy, or corporate guarantee and financial documentation required pursuant to 40 C.F.R. § 264.143(f)(3)) shall be consistent with the requirements of such forms contained in 40 C.F.R. § 264.151, to the extent appropriate to the Work required under this Consent Decree and shall have been pre-approved by EPA after consultation with OEPA. The initial financial assurance instruments, including all required documentation, shall be submitted by Defendant to the EPA Project Coordinator.

x.     Except as provided in Subparagraph 24.b.xii below, in the event that:

(1)     EPA, after consultation with OEPA, determines at any time that a financial assurance instrument provided pursuant to this Paragraph is inadequate, or otherwise no longer satisfies the requirements set forth or incorporated by reference in this Paragraph, whether such determination is based on an increase in the estimated cost of completing the Work, any financial reports or statements required pursuant to Subparagraph 24.b.v, or any other information relevant to the financial condition of AK Steel or any of its financial assurance providers, or

(2)     Defendant becomes aware at any time of information indicating that any financial assurance instrument provided pursuant to this Paragraph is inadequate or otherwise no longer satisfies the requirements set forth or

32

incorporated by reference in this Paragraph, whether due to an increase in the estimated cost of completing the Work, information in any reports or statements required pursuant to Subparagraph 24.b.v, or any other information relevant to the financial condition of AK Steel or any of its financial assurance providers,

Defendant, within thirty (30) days of receipt of notice of EPA's determination or, as the case may be, within thirty (30) days of becoming aware of such information, shall obtain and submit for approval a revised or alternative form of financial assurance that satisfies all requirements set forth or incorporated by reference in this Paragraph. Such revised or alternative form of financial assurance shall be submitted by Defendant to the EPA Project Coordinator.

xi. Defendant's inability to post financial assurance for completion of the Work shall in no way excuse performance of any other requirements of this Consent Decree, including, without limitation, the obligation of Defendant to complete the Work in strict accordance with the terms of this Consent Decree.

xii. Any and all financial assurance instruments provided pursuant to Subparagraphs 24.b.ii.(2), (3), (4) or (5) shall be automatically renewed at the time of their expiration unless the financial assurance provider has notified both the Defendant and the EPA Project Coordinator at least one hundred and twenty (120) days prior to expiration, cancellation or termination of the instrument of a decision to cancel, terminate, or not renew a financial assurance instrument. Under the terms of the financial assurance instrument, the 120 days will begin to run with the date of receipt of the notice by both the EPA Project Coordinator and Defendant. If the EPA Project

33

Coordinator and Defendant receive notice on different dates, the 120 day period will begin to run from the latter date of receipt. Furthermore, if Defendant has failed to provide alternate financial assurance and obtain written approval for such alternate financial assurance following receipt of such notice by both Defendant and the EPA Project Coordinator, then the EPA Project Coordinator shall have the authority to access the financial assurance mechanism in accordance with the following:

(1) for surety bonds addressed in Subparagraph 24.b.ii.(2), if Defendant does not obtain written approval for such alternative financial assurance within 90 days following receipt of such notice by both Defendant and the EPA Project Coordinator, the surety shall place funds in the amount guaranteed in the standby trust fund as directed by the EPA Project Coordinator;

(2) for a letter of credit addressed in Subparagraph 24.b.ii.(3), if Defendant does not obtain written approval for such alternate financial assurance within ninety (90) days following receipt of such notice by both Defendant and the EPA Project Coordinator, then the EPA Project Coordinator may draw upon the letter of credit;

(3) for insurance policies addressed under Subparagraph 24.b.ii.(4), the policy will remain in full force and effect;

(4) for written corporate guarantees addressed under Subparagraph 24.b.ii.(5), pursuant to the terms of the guarantee, which pursuant to Subparagraph 24.b.ii.(5) must satisfy the requirements of 40 C.F.R. § 264.143(f)(10).

34

The EPA Project Coordinator may delay accessing the financial assurance instrument, if the financial assurance provider grants an extension of the financial assurance instrument. During the last thirty (30) days of any extension, the EPA Project Coordinator may access the financial assurance instrument as set forth above.

      xiii.     Any and all financial assurance instruments provided pursuant to this Consent Decree shall provide for timely payment, as directed by EPA, or performance of the Work in accordance with this Consent Decree, or a combination of payment and Work, in the event that EPA determines that Defendant: (A) has ceased implementation of any portion of the Work, (B) is significantly or repeatedly deficient or late in its performance of the Work, or (C) is implementing the Work in a manner that may cause an endangerment to human health or the environment. In the event that EPA, after consultation with OEPA, determines that any of the circumstances described in Clauses (A), (B), or (C) of this Subparagraph 24.b.xiii has occurred, Defendant hereby acknowledges that EPA shall have the right to access without undue delay any and all financial assurance instruments provided pursuant to this Paragraph. The EPA Project Coordinator shall notify in writing both Defendant and the financial assurance provider of such a determination, and shall direct the financial assurance provider to, as expeditiously as practicable, (1) arrange for performance of the Work or (2) deposit into the standby trust fund, or a newly created trust fund meeting the requirements of Subparagraph 24.b.ii.(1) approved by EPA, the remaining funds obligated under the financial assurance instrument for the performance of the Work in accordance with this Consent Decree.

35

xiv.     Defendant may invoke the procedures set forth in Section XIII (Dispute Resolution) of this Consent Decree to dispute EPA's determination that any of the circumstances described in Clauses (A), (B), or (C) of Subparagraph 24.b.xiii have occurred. Invoking the dispute resolution provisions shall not excuse, toll or suspend the obligation of the financial assurance provider, under Subparagraph 24.b.xiii, to fund the trust fund, but if Defendant disputes EPA's determination under Subparagraph 24.b.xiii, EPA will not direct the trustee to make any payments from the trust fund, pending resolution of the dispute. If Defendant prevails in dispute resolution, all funds in the trust fund, including any interest that accrued on the funds, shall be returned to the financial assurance provider to the extent that (A) the financial assurance provider is the Defendant, or (B) the financial assurance provider is a third party who has agreed to continue providing financial assurance to the Defendant as it had prior to EPA's direction to deposit funds in a trust fund pursuant to Subparagraph 24.b.xiii.

xv.     If EPA has determined that any of the circumstances described in Clauses (A), (B), or (C) of Subparagraph 24.b.xiii have occurred, and if EPA is nevertheless unable after reasonable efforts to secure the payment of funds or performance of the Work in accordance with this Consent Decree from the financial assurance provider pursuant to this Consent Decree, then, upon receiving written notice from EPA, Defendant shall within ten (10) days thereafter deposit into the standby trust fund, or a newly created trust fund approved by EPA, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount equal to the estimated cost of the remaining Work to be performed in accordance with this Consent Decree as of

36

such date, as determined by EPA.

xvi.    If Defendant believes that the estimated cost to complete the remaining
Work has diminished below the amount covered by the existing financial assurance
provided under this Consent Decree, Defendant may, on any anniversary date of the
effective date of this Consent Decree, sixty (60) days prior to the close of the fiscal year,
or at any other time agreed to by EPA after consultation with OEPA, submit a written
proposal to EPA and OEPA for approval by EPA after consultation with OEPA to reduce
the amount of the financial assurance provided under this Paragraph to the estimated cost
of the remaining Work to be performed. The written proposal shall specify the cost of
the remaining Work to be performed and the basis upon which such cost was calculated.
EPA shall notify Defendant of its decision regarding such a proposal in writing within
ninety (90) days of receipt of the proposal. Defendant may reduce the amount of the
financial assurance only after receiving EPA's written decision and only in accordance
with and to the extent permitted by such written decision.

xvii.    If Defendant desires to change the form of financial assurance, Defendant
may, no more than once per fiscal year, submit a written proposal to EPA and OEPA, for
approval by EPA after consultation with OEPA, to change the form of financial
assurance. Such a proposal shall specify, at a minimum, the cost of the remaining Work
to be performed, the basis upon which such cost was calculated, and a detailed
description of the proposed revised form of financial assurance. After reasonable
opportunity for review and comment by OEPA, EPA shall notify the Defendant of its
decision regarding such a proposal in writing. After receiving EPA's written acceptance,

37

Defendant may change the form of financial assurance in accordance with and to the extent permitted by such written acceptance.

xviii. At such time as EPA and Defendant have submitted for the Court's approval a joint stipulation providing for termination of the Defendant's obligations pursuant to Paragraph 124.b of this Consent Decree, Defendant may submit to the EPA Project Coordinator a written request that EPA release Defendant from the requirement to maintain financial assurance under this Paragraph 24, except with respect to the financial assurance requirement referred to in Subparagraph 124.c.ii. The EPA Project Coordinator shall notify both the Defendant and the provider(s) of the financial assurance that Defendant is released from such financial assurance obligations under this Consent Decree. Upon completion of all operation and maintenance activities required pursuant to this Consent Decree, Defendant may submit to the EPA Project Coordinator a written request that EPA release Defendant from all remaining financial assurance requirements under this Paragraph 24. In all cases, the provider of the financial assurance may be released from its obligations under the instrument only upon a written release from the EPA Project Coordinator.

c. Defendant shall provide copies of the financial assurance documents, instruments and information submitted to EPA and OEPA pursuant to Subparagraphs 24.a. and 24.b to Intervenors for their review. To the extent that such documents contain information which Defendant identifies as confidential business information protected from disclosure under federal and Ohio law, Defendant will provide Intervenors with such confidential business information following entry into a confidentiality agreement. This confidentiality agreement will be

38

provided to Intervenors simultaneously with the submission of the confidential business information to EPA and OEPA. Nothing in this Paragraph 24 constitutes a waiver of a claim of confidentiality under federal or state law. Additionally, nothing in this Paragraph 24 is intended to restrict Intervenors' right to comment to EPA and OEPA concerning the financial assurance information submitted by Defendant. So long as Defendant has timely submitted to EPA financial assurance documents required under Paragraph 24, the process shall not be delayed in any way due to Intervenors' review of financial assurances documents, instruments or information.

## VI. SUPPLEMENTAL ENVIRONMENTAL PROJECT

25.     Defendant shall implement the Refrigerant Conversion Supplemental Environmental Project ("SEP"), as more fully described in the SEP SOW, attached hereto as Attachment 3 and incorporated herein by reference, in accordance with EPA's May 1, 1998, EPA Supplemental Environmental Projects Policy (the "SEP Policy"). The Parties agree that the SEP is intended to secure significant environmental or public health protection and improvements.

26.     Performance of the SEP shall not be construed as prohibiting, altering or in any way limiting EPA's or OEPA's authority to enforce any applicable environmental requirements at Defendant's facilities, or Defendant's duty to comply with such requirements.

27.     The total expenditure for the SEP shall be in accordance with the specifications set forth in the SEP SOW and shall be not less than the following: $750,000. Defendant shall include documentation of the expenditures made in connection with the SEP as part of the SEP Completion Report.

39

28.     Defendant hereby certifies that, as of the date of its execution of this Consent Decree,

Defendant is not required to perform or develop the SEP by any federal, state or local law or

regulation; nor is Defendant required to perform or develop the SEP by any other agreement,

grant or as injunctive relief in this or any other case. Defendant further certifies that it has not

received, and is not presently negotiating to receive, credit in any other enforcement action for

the SEP. In addition, Defendant certifies that the SEP had not been started by Defendant, or

funds committed thereto by Defendant, prior to the commencement of settlement discussions in

this matter, and that the SEP is being performed in settlement of this litigation. If, prior to entry

of this Consent Decree, any change of circumstance affects the continued accuracy of any

certification referred to in this Paragraph, Defendant shall expeditiously as practicable, but in no

event later than ten (10) working days after the change in circumstance, describing the changed

circumstance and identifying each certification that is no longer accurate.

29.     SEP Reports.

        a.      Completion Report. Defendant shall submit a SEP Completion Report to

Plaintiffs within sixty (60) days after the SEP described in Paragraph 25 has been completed.

The SEP Completion Report shall contain the following information:

        i.      A detailed description of the SEP as implemented, including a description

of any deviations from the SEP SOW for the SEP, and, if deviations were necessary, a

description of any operating problems encountered and the solutions thereto;

        ii.     Itemized costs for the SEP;

        iii.    Certification that the SEP has been fully implemented pursuant to the

provisions of this Consent Decree;

40